# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

IRVING E. GOTTSCHALK, Regional Director of the
Thirtieth Region of the National Labor
Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

PIGGLY WIGGLY MIDWEST, LLC,

Respondent.

Civil No.

## PETITIONER'S MEMORANDUM IN SUPPORT OF THE PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

Submitted by:

Andrew S. Gollin, Esq.
Renee M. Medved, Esq.
Counsels for Petitioner
National Labor Relations Board
Thirtieth Region
Suite 700, Henry S. Reuss Federal Plaza
310 West Wisconsin Avenue
Milwaukee, Wisconsin 53203

# TABLE OF CONTENTS

Page

I.      STATEMENT OF THE CASE..................................................................... 1

II.     OVERVIEW ............................................................................................. 2

III.    BACKGROUND ....................................................................................... 2

IV.     STATUTORY SCHEME FOR SECTION 10(j) INJUNCTIVE RELIEF ...... 7

        A.  Petitioner has a Reasonable Likelihood of success on the Merits. ........... 10

        B.  There is no Adequate Remedy at Law and Irreparable Harm will
            Result Absent the Imposition of the Injunction......................................... 19

        C.  Balancing the equities favors the granting of the injunction against
            Respondent ........................................................................................ 24

        D.  The Public Interest Necessitates Issuance of 10(j) Injunction................... 28

V.      CONCLUSION ........................................................................................ 29

Case 2:12-cv-00152-CNC   Filed 02/14/12   Page 2 of 37   Document 1-2

**Cases**                                                                                           **Page**

*Aguayo v. South Coast Refuse Corp.*, 161 LRRM 2867, 1999 WL
547861 (C.D. Cal. 1999)................................................................................... 26

*Aguayo v. Tomco Carburetor Co.,* 853 F.2d 744 (9th Cir. 1988)...................................... 27

*American Federation of Government Employees v. Callaway,*
398 F.Supp. 176 (N.D.Ala.1975) ........................................................................ 19

*Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531 (1987)........................................... 25

*Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990)........................... 25

*Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23 (1st Cir. 1986) ............................... 11, 24

*Barbour v. Central Cartage, Inc.,* 583 F.2d 335 (7th Cir. 1978)....................................... 30

*Bloedorn v. Francisco Foods*, 276 F.3d 270 (7th Cir. 2001)................................. 8, 9-12,
                                                                                                 20, 25,
                                                                                                 27, 28

*Blyer v. Jung Sun Laundry Group Corp.*, 2010 WL 4722286
(E.D.N.Y. November 15, 2010) .......................................................................... 20

*Canteen Corp. v. NLRB*, 103 F.3d 1355 (7th Cir. 1997) .................................................18

*Carpenters Local 1031*, 321 NLRB 30 (1996) ............................................................ 13

*Caterpillar, Inc.*, 355 NLRB No. 91 (August 17, 2010)................................................... 15, 16

*Ciba-Geigg Pharmaceutical Division*, 264 NLRB 1013 (1982) ....................................... 13

*Control Services, Inc.,* 303 NLRB 481 (1991), *enfd mem.*
975 F.2d 1551 (3d Cir.1992)............................................................................. 18

*Courier-Journal*, 342 NLRB 1093 (2004)................................................................. 15

*D'Amico v. United States Service Industries. Inc.*, 867 F. Supp. 1075 (D. D.C. 1994)...... 29

*Danielson v. Joint Bd. Of Coat, Suit, & Allied Garment Workers Union,*
494 F.2d 1230 (2nd Cir. 1974)........................................................................... 11

*E.I. Dupont de Nemours*, 355 NLRB No. 176 (August 27, 2010)...................................... 14, 17

Case 2:12-cv-00152-CNC   Filed 02/14/12   Page 3 of 37   Document 1-2

*Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902
(3d Cir. 1981) ................................................................................ 25, 27

*Electrical Workers v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243 (D.C. Cir.),
*cert. denied*, 400 U.S. 950 (1970) .................................................... 24

*Eugene Iovine, Inc.*, 328 NLRB 294 (1999) ...................................... 13

*Fiberboard Corp. v. NLRB*, 379 U.S. 203 (1964) .............................. 12

*Florida-Texas, Inc.*, 203 NLRB 509 (1973), *enf'd.*, 489 F.2d 1275
(6th Cir. 1974) .................................................................................. 22

*Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011) ........................ 23

*Franks Bros. Co. v. NLRB*, 321 U.S. 702 (1944) ............................... 20

*Gonzalez v. Chasen*, 506 F.Supp. 990 (D.P.R.1980) ......................... 19

*Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161 (E.D. Mich. 1979) .......................... 27

*Henderson v. Operating Engineers Local 701*, 420 F.2d 802 (9th Cir. 1969) ................. 29

*Herman Sausage Co.*, 122 NLRB 168 (1958), *enf'd.*, 275 F.2d 229 (5th Cir. 1960) ......... 22

*Hoosier Energy Rural Elec. Coop, Inc. v. John Hancock Life Ins. Co.*,
582 F.3d 721 (7th Cir. 2009) ............................................................ 8, 9

*International Assn. of Machinists & Aerospace Workers v. Trans World
Airlines, Inc.*, 601 F. Supp. 1363 (W.D. Mo. 1985) .......................... 19

*Judge v. Quinn*, 612 F.2d 537 (7th Cir. 2010) .................................. 9

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980) ......... 26

*Kingsbridge Heights Rehabilitation & Care Center,* 353 NLRB 631 (2008) ................... 3

*Kinney v. Pioneer Press*, 881 F.2d 485 (7th Cir. 1989) ..................... 8, 11,
24, 28

*Kobell v. United Paperworkers Int'l. Union*, 965 F.2d 1401 (6th Cir. 1986) ................ 11

*Kobell v. United Refining Co.*, 159 LRRM 2762, 1998
WL 794860 (W.D. Pa. 1998) ............................................................ 23

*Ladies Garment Workers Union (McLaughlin Mfg. Corp.) v. NLRB,*
463 F.2d 907 (D.C. Cir. 1972) ............................................................ 13

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48 (2d Cir. 2004) ................ 19

*Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011).................................... 8, 20

*Lineback v. Spurlino Materials, LLC*, 546 F.3d 491 (7th Cir. 2008) ................................ 8, 9,
10, 28

*Local 65-B, Graphic Communications Conference of the International
Brotherhood of Teamsters v. NLRB*, 572 F.3d 342 (7th Cir. 2009).................................... 14

*Local Union No. 884, United Rubber, Cork, Linoleum & Plastic Workers v.
Bridgestone/Firestone,* 61 F.3d 1347 (8th Cir.1995)…………………………….………… 19

*Long Island Head Start Child Development Center*, 345 NLRB 973 (2005),
*enf. denied on other grounds*, 460 F.3d 254 (2nd Cir. 2006) ............................................ 14

*M & M Contractors*, 262 NLRB 1472 (1982) .................................................................. 13

*M. A. Harrison Mfg.*, 253 NLRB 675 (1980), *enfd.,*
682 F.2d 580 (6th Cir. 1982) ............................................................................................ 13

*Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953
(1st Cir. 1983) .................................................................................................................. 27

*Mattina v. Kingsbridge Heights Rehab. & Care Center*, 184 LRRM 3060,
2008 WL 3833949 (S.D.N.Y. 2008)................................................................................. 20

*Medicenter Mid-South Hospital*, 221 NLRB 670 (1975) .................................................. 13

*Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983) ................................................. 13

*Mid-Continent Concrete*, 336 NLRB 258 (2001), *enfd.*, 308 F.3d
859 (8th Cir. 2002)........................................................................................................... 13

*Miller v. California Pacific*, 19 F.3d 449 (9th Cir. 1994)................................................ 11, 25

*Moore-Duncan v. Horizon House Developmental Services*, 155 F. Supp.
2d 390 (E.D. Pa. 2001)..................................................................................................... 24

*Morgan v. Fletcher,* 518 F.2d 236 (5th Cir.1975) ........................................................... 19

*Moran v. LaFarge*, 286 F.Supp.2d. 1002 (N.D. Ind. 2003)............................................ 28

*Morio v. North American Soccer League*, 632 F.2d 217 (2d Cir. 1980) .......................... 23

*NLRB v. Borg-Warner Corp.*, 356 U.S. 342 (1958) ............................................................ 12

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996)................................................. 8, 9, 10, 11, 28

*NLRB v. Haberman Constr. Co.,* 641 F.2d 351 (5th Cir.1981) .......................................... 18

*NLRB v. Hardesty Co., Inc.*, 308 F.3d 859 (8th Cir. 2002) ................................................ 23

*NLRB v. Katz*, 369 U.S. 736 (1962)................................................................................ 12, 22

*NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887 (7th Cir. 1990) ......................................... 8

*NLRB v. Parents & Friends of the Specialized Living Center*,
879 F.2d 1442 (7th Cir. 1989) ............................................................................................. 12

*NLRB v. Pinkston-Hollar Construction Services*, 954 F.2d 306 (5th Cir. 1992)............... 12

*Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010)........................................... 23

*Overstreet v. El Paso Disposal, L.P.*, 668 F. Supp. 2d 998 (W.D. Tex. 2009) ................. 23

*Overstreet v. Thomas Davis Medical Centers, P.C.*,
9 F. Supp. 2d 1162 (D. Ariz. 1997) .............................................................................. 23, 26

*Palm Beach Metro Transportation, LLC*, 357 NLRB No. 26 (July 26, 2011) ................. 13, 16

*Penello v. United Mine Workers*, 88 F. Supp. 935 (D. D.C. 1950) ................................ 26, 29

*Piggly Wiggly Midwest, LLC*, 357 NLRB No. 191 (2012)................................................. 1

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001) ...................................................... 27

*RCR Sportswear, Inc.,* 312 NLRB 513 (1993) .................................................................. 18

*Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir. 1984) .................... 24

*Scott v. Pacific Custom Materials, Inc.*, 939 F. Supp. 1443
(N.D. Cal. 1996) ................................................................................................................. 27

*Scott v. Stephen Dunn & Associates*, 241 F.3d 652 (9th Cir. 2001) ................................ 26

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975)........................................... 26

*Silverman v. Major League Baseball Player Relations Committee, Inc.*,
67 F.3d 1054 (2d Cir. 1995)........................................................................................... 22, 26

Case 2:12-cv-00152-CNC   Filed 02/14/12   Page 6 of 37   Document 1-2

*Small v. Southern California Permanente Medical Group*, 189 LRRM 3025,
3026-27, 2010 WL 5509922 (C.D. Cal. 2010) ...................................................... 26

*Southwest Forest Indus., Inc. v. NLRB*, 841 F.2d 270 (9th Cir. 1988) ............................ 22

*Spurlino Materials, LLC v. NLRB*, 645 F.3d 870 (7th Cir. 2011) ...................................... 12

*Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735
(7th Cir. 1976).................................................................................................................. 24

*Texaco Independent Union of Coraopolis Terminal v. Texaco, Inc.,*
452 F.Supp. 1097 (W.D.Pa.1978)....................................................................................... 19

*The Little Rock Downtowner, Inc.*, 168 NLRB 107 (1967),
*enf'd.,* 414 F.2d 1084 (8th Cir. 1969).............................................................................. 22

*Triple A Fire Protection, Inc.,* 315 NLRB 409 (1994) ...................................................... 3

*United Steelworkers of America v. Ft. Pitt Steel Casting, Div. of*
*Conval-Penn, Inc.,* 598 F.2d 1273 (3d Cir.1979) ............................................................ 19

*Whelan v. Colgan,* 602 F.2d 1060 (2nd Cir.1979)............................................................. 19

## **Statutes**

29 U.S.C. §158(a)(1)............................................................................................... 1, 7, 18

29 U.S.C. §158(a)(3)..................................................................................................... 1, 5, 6,
7, 18

29 U.S.C. §158(a)(5)..................................................................................................... 1, 5, 6
7, 18

29 U.S.C. §160(j) ......................................................................................................... 1, 7

# I. STATEMENT OF THE CASE[1]

Petitioner Irving E. Gottschalk, Regional Director for Region Thirty of the National Labor Relations Board ("Board"), has petitioned this Court, for and on behalf of the Board and/or the Acting General Counsel of the Board, pursuant to Section 10(j) of the National Labor Relations Act ("Act") [29 U.S.C. Section 160(j)][2] for appropriate injunctive relief pending the final disposition of the matters by the Board in a Complaint and Notice of Hearing in Case 30-CA-067117 issued by the Acting General Counsel of the Board alleging that Piggly Wiggly Midwest, LLC (Respondent) violated Sections 8(a)(1), (3), and (5) of the Act [29 U.S.C. §§158(a)(1), (3), and (5)], by engaging in a series of unfair labor practices.[3]  The trial before an administrative law judge of the Board in Case 30-CA-067117 will begin on February 22, 2012.[4]

---

[1] Exhibit References are to the Exhibits attached to the Petition for Injunction Under Section 10(j) of the National Labor Relations Act, As Amended ("Petition").

[2] Section 10(j) of the Act [29 U.S.C. Section 160(j)] provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

[3] Respondent is a recidivist with a history of engaging in bad-faith bargaining to undermine its employees' statutory rights.  See *Piggly Wiggly Midwest, LLC,* 357 NLRB No. 191, slip op. at 2 (2012), which involved this Employer bargaining in bad faith with the Union by failing to provide it with requested sales and franchise agreements.  (Exhibit 9)  As a result, the Union was and continues to be precluded from engaging in effects bargaining over sale of the stores, including the sister Sheboygan store (Store 31) to the store now at issue.

[4] The factual assertions set forth herein will be established through the administrative record and any supplemental evidence which the Petitioner will submit following the Court's Order Granting Motion to Try Petition for Injunction Under Section 10(j) of the National Labor Relations Act, As Amended, on the Record Made Before an Administrative Law Judge.

1

## II.   OVERVIEW

The United Food and Commercial Workers Union, Local 1473 ("Union") is the exclusive collective-bargaining representative for a unit of retail clerks and a unit of meat department employees working for Respondent at its grocery store located at 3124 South Business Drive, Sheboygan, Wisconsin ("Store 15").  The two units are fully described in the Petition.

On around September 18, 2011, Respondent unilaterally reduced 19 bargaining unit employees from full-time to part-time, resulting in the employees losing their hours and certain contractual benefits, most notably health insurance.  Under Board law, Respondent is required to provide the Union with prior notice and an opportunity to bargain over changes to the employees' wages, hours, and other terms and conditions of employment, including changes to their hours and days of work.  There is no dispute Respondent failed or refused to provide the Union with prior notice and an opportunity to bargain over the reductions.  By its conduct, Respondent forced employees to work under conditions that were in derogation of their statutory right to bargain.  Four of the affected employees were constructively discharged because each quit after Respondent reduced them to part-time status, causing them to lose hours and certain of their contractual benefits.  Based upon the evidence--much of which is undisputed--Petitioner has a strong likelihood of prevailing before the Board on the merits of the allegations contained in the Petition.  Additionally, Petitioner will demonstrate that the requested injunctive relief is a "just and proper" remedy necessary to restore the status quo.

## III.   BACKGROUND

Respondent is a wholesaler of grocery, meat and produce to franchise stores and an operator of a number of corporate retail grocery stores with places of business throughout the Midwest, including a store in Sheboygan, Wisconsin (Store 15).  Paul Butera is Respondent's

2

owner. Mary Zenisek is Respondent's Manager of Retail Operations and Employee Representative. John Braunreiter, Jr. is one of Respondent's District Managers. Daniel Holtz, Sr. is the Sheboygan Store Manager. The Union is a labor organization within the meaning of Section 2(5) of the Act. The Union is the exclusive collective-bargaining representative of the retail clerk employees and the meat department employees working at Respondent's Sheboygan store. John Eiden, Sr. is the Union's President. Grant Withers is the Union's Secretary/Treasurer. Cecilia Prickett is the Union's representative for the Sheboygan store.

In around September 2011, there were approximately 54 full-time employees working at Store 15. The retail employees and the meat employees were covered under separate collective-bargaining agreements. Both agreements are dated May 7, 2009 to September 7, 2011.

On June 27, 2011, the Union requested to commence negotiations with Respondent for successor agreements. The parties, however, met just once to exchange proposals, and there was no oral or written agreement to extend the terms of the expired agreements. As a result, the collective-bargaining agreements both expired on September 7, 2011.[5]

Beginning on September 14, 2011, admittedly without providing the Union with any prior notice or an opportunity to bargain, Store Manager Holtz and District Manager Braunreiter, individually notified 19 bargaining unit employees that they were being reduced from full-time to part-time status, effective September 18, 2011.[6] The reason Holtz and Braunreiter gave

---

[5] Under Board law, after a collective-bargaining agreement expires, the employer is required to maintain the status quo on all mandatory subjects of bargaining until the parties either agree on a new contract or reach a good-faith impasse in negotiations. *Triple A Fire Protection, Inc.,* 315 NLRB 409, 414 (1994); *Kingsbridge Heights Rehabilitation & Care Center,* 353 NLRB 631 (2008). An employer may not implement its own terms and conditions of employment absent impasse or waiver by the union.

[6] The names of the 19 employees reduced from full-time to part-time and their years of service are as follows: Lauriel A. Hansen (22 years), Kimberly V. Fischer (16 years), Shantal R. Edler (18 years), David A. Meinhardt (23 years), Tina M. Meinhardt (18 years), Jeffrey W. Gross (23

employees for the reductions was that a competitor (Festival Foods) was going to open a new grocery store approximately three and a half miles away from Store 15, and Respondent projected that the new store would cause sales to drop for Store 15. Because Respondent failed or refused to provide the Union with prior notice or an opportunity to bargain over these reductions, there were no Union representatives present for these meetings.

The new Festival Foods store opened on around September 16, 2011. Respondent had been aware that Festival Foods was going to be opening this store since at least January 2011. However, it was not until mid-September 2011, a few days before the store opened, that Respondent decided to reduce full-time positions *in anticipation* that the new store would result in a loss of sales for Store 15.

The harm of these unilateral reductions was profound. Several of the affected employees had their hours reduced by twenty percent or more, resulting in a substantial loss of income.[7] Additionally, under the terms of the expired agreements, employees are eligible for benefits based upon the number of hours they work, on average, per week. Full-time employees receive benefits such as health insurance, paid vacation, paid personal days, paid jury duty leave, and time-and-a half for Sunday work. Part-time employees do not. Consequently, the employees who were reduced to part-time status lost the above contractual benefits.[8]

---

years), Robin Schubert (7 years), Brenda J. Thede (11 years), Andrew Sommersberger (8 years), Abraham A. Gerharz (9 years), Debra A. Gerdes (10 years), Laura M. Hoffmann (22 years), Sue F. Fliss (19 years), Laurie Hoppert (32 years), Patricia Gruenke (31 years), Tanya L. Weisfeld (16 years), Tammy L. Edler (20 years), Kelly S. Haack (19 years), and Louis E. Rowden (22 years). Everyone but Sommersberger and Thede is in the retail clerks unit.

[7] The loss of wages varied among the 19 affected employees, but, on average, the employees lost one-third of their normal weekly income, resulting for many in a loss of around $600 a month.

[8] Three of the reduced employees (Laurie Hoppert, Robin Schubert, and Tammy Edler) were able to bump into other positions allowing them to remain full-time and not lose their benefits.

To date, four of the affected employees (Jeffrey Gross, Lauriel Hansen, Laura Hoffmann and Tina Meinhardt) quit because their reduction to part-time status caused them to lose approximately twenty percent or more of their hours and several of their contractual benefits, most notably their health insurance coverage. The four were forced to choose between remaining with Respondent without these contractual benefits or seek employment elsewhere.[9] They chose the latter. Several of the other full-time employees have discussed looking elsewhere for employment out of fear that Respondent similarly will reduce their hours to part-time status or otherwise unilaterally change their wages, hours, or other terms and conditions of employment. In other words, there is fear that Respondent will again disregard its statutory obligations and continue to unilaterally make changes to mandatory subjects of bargaining without providing the Union with prior notice and an opportunity to negotiate over such changes. This fear is justified by Respondent's stated intention to make further reductions to respond to a further anticipated drop in sales over another competitor opening a store in the area, without bargaining with the Union over those reductions. (Exhibits 15 and 16).[10]

By failing to provide the Union with prior notice or an opportunity to bargain over these reductions, Respondent violated Section 8(a)(5) of the Act [29 U.S.C. § 158(a)(5)]. Also, based upon the circumstances, which resulted in the constructive discharge of four employees, Respondent discriminated against the affected employees in regard to their terms or conditions of

---

[9] On January 13, 2012, Respondent bypassed the Union and dealt directly with one of the constructively discharged employees when it offered to rehire her to her prior position, but at different wages, hours, and other terms and conditions of employment from those set forth in the collective-bargaining agreements and from what she made prior to her constructive discharge. (Exhibits 6(a), 6(b), 7(a), and 7(b)).

[10] With regards to Respondent's stated intention to make further reductions, as evidenced by its January 18, 2012 letter to the Union (Exhibit 15), Respondent's letter states a willingness to only discuss with the Union the effects of those reductions, but not the decision to make those reductions. Under Board law, Respondent has an obligation to bargain over both the decision to make any reductions and the effects of those reductions, not just to bargain over the effects.

employment to discourage support for the Union, in violation of Section 8(a)(3) of the Act [29 U.S.C. §158(a)(3)].

The first notice the Union received of the reductions was when one of the affected employees called and spoke to Union Secretary/Treasurer Grant Withers on September 15 to report what had happened. Withers told the employee that someone from the Union would be at the Sheboygan store the next day. On September 15, 2011, Respondent's Retail Service Operations Manager, Mary Zenisek, sent Union President John Eiden a letter chastising the Union for not immediately responding to employee questions and concerns about the reductions. (Exhibit 10).

Respondent also posted the above letter on bulletin boards visible to employees at Store 15 in Sheboygan.[11] On September 16, 2011, the Union began filing individual grievances against Respondent regarding the reductions. In processing those grievances, the Union has requested information that is relevant and necessary to it in representing unit employees during negotiations and in grievance handling, some of which Respondent still has failed or refuses to provide. This is a continuation of Respondent's earlier conduct which resulted in the Board's prior finding that Respondent has been failing or refusing to bargain with the Union by not providing it with critical information the Union still needs to allow it to bargain in that case.[12]

---

[11] The Union represents employees working at five of Respondent's other stores in the State of Wisconsin, including a store in Menasha. On the same day Respondent posted this September 15 letter denigrating the Union at Store 15, it also posted a Memorandum denigrating the Union at its Menasha store regarding the parties' negotiations over an agreement for that store, attempting to create dissent among the employees at the Menasha store by claiming that the Union cares more about employees at other locations than it does about the employees at the Menasha store. (Exhibit 11) This is the same sort of dissent that Respondent was attempting to create with its September 15, 2011 posting at Store 15. These postings reveal Respondent's true motivation, which is to create disaffection among the employees toward the Union.

[12] See footnote 3.

On September 19, 2011, Union President John Eiden sent a letter to Zenisek. (Exhibit 12) In this letter, Eiden stated the Union and its members were disturbed by Respondent's actions to reduce their hours and take home pay, and that Piggly Wiggly was solely responsible for the reduction in hours, the pay of its employees, their health insurance and pension benefits. Eiden also stated in his letter that "Paul Butera is destroying the lives of the people who work for him. The Union will continue to fight Mr. Butera's attempts to drive his workers into poverty." On September 22, 2011, Zenisek responded in a letter to Eiden, blaming the Union for the reductions. (Exhibit 13) The evidence establishes that this letter also was posted in the store for employees to see.

Respondent has continued to deny the grievances the Union filed on behalf of the 19 employees reduced from full time to part time, and there has been no resolution. Additionally, since the reductions, Respondent has hired several new part-time employees to work at Store 15, and it continues to advertise for additional part-time employees, which dispels Respondent's claim that the September 2011 reductions were not due, in part, to the need to reduce labor costs associated with the benefits offered to its full-time employees.

On December 28, 2011, the Petitioner issued a Complaint and Notice of Hearing against Respondent alleging that it has committed numerous violations of Sections 8(a)(1), (3) and (5) of the Act [29 U.S.C. §§158(a)(1), (3), and (5)]. The administrative hearing on these allegations is scheduled to commence on February 22, 2012.

## IV.    STATUTORY SCHEME FOR SECTION 10(J) INJUNCTIVE RELIEF

Section 10(j) of the Act, 29 U.S.C. §160(j), authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. This provision reflects Congressional recognition that, because the Board's administrative

proceedings often are protracted, in may instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffective. *Kinney v. Pioneer Press*, 881 F.2d 485, 487-88(7th Cir. 1989); *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 891 (7th Cir. 1990)(citing S.Rep. NO. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947)). Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation.

Section 10(j) directs district courts to grant relief that is "just and proper." See *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011). The Seventh Circuit holds that to determine what relief is "just and proper," district courts should apply the general equitable standards for considering requests for preliminary injunctions. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499-500 (7th Cir. 2008); *Bloedorn v. Francisco Foods*, 276 F.3d at 270, 286 (7th Cir. 2001); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996); *Kinney v. Pioneer Press*, 881 F.2d at 490. The Regional Director is entitled to interim relief when: (1) the Director has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public harm" would occur in the absence of interim relief; and (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint. *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 500; *Bloedorn v. Francisco Foods*, 276 F.3d at 286.

The Director bears the burden of establishing the first, third and fourth prongs by a preponderance of the evidence. *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 500; *Bloedorn v. Francisco Foods*, 276 F.3d at 286. "The second prong is evaluated on a sliding scale: the better the Director's case on the merits, the less its burden to prove that the harm in delay would

be irreparable, and vice versa." *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 500, quoting *Bloedorn v. Francisco Foods*, 276 F.3d at 286, 298. See also *Hoosier Energy Rural Elec. Coop, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). Under this sliding scale, the strength of a petitioner's showing of likely success on the merits affects the court's assessment of the second factor, the relative harms posed by the grant or denial of injunctive relief: the greater the prospects of a petitioner prevailing are, the less compelling a petitioner's showing with regard to irreparable harm needs to be. See *NLRB v. Electro-Voice*, 83 F.3d at 1567-68. See also *Bloedorn v. Francisco Foods*, 276 F.3d at 286-87. In other words, a strong showing of likely success on the merits can offset a weak showing of harm. *NLRB v. Electro-Voice*, 83 F.3d at 1568. The Seventh Circuit continues to adhere to a sliding scale analysis in preliminary injunction cases. See *Judge v. Quinn*, 612 F.2d 537, 546 (7th Cir. 2010) ("the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted"), amended on other grounds, 387 Fed. Appx. 529 (7th Cir. 2010), cert. denied 131 S. Ct. 2958 (2011).

In evaluating Section 10(j) petitions, a district court has no jurisdiction to pass on the merits of the underlying case before the Board. *NLRB v. Electro-Voice*, 83 F.3d at 1567. Rather, in considering the four factors above, a court's mission is to determine whether the harm to the employees' statutory right to representation that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual. *NLRB v. Electro-Voice*, 83 F.3d at 1567 ("If the delay [is] long enough, or the sin grave enough, the Board's order might come too late to do any good." (quoting *Pioneer Press*, 881 F.2d at 487)). Further, the Seventh Circuit has held that injunctive relief is not only limited to serious and extraordinary circumstances. *NLRB v. Electro-*

*Voice*, 83 F.3d at 1567 (quoting *NLRB v. Pioneer Press*, 881 F.2d at 493).[13]   Although a petitioning regional director is not entitled to prevail by merely filing a charge, once a petitioner presents evidence sufficient to tip the scales in his or her favor under the equitable standards articulated above, nothing more is required.  *NLRB v. Electro-Voice*, 83 F.3d at 1567.  Section 10(j) injunctive relief is warranted in this case for the following reasons.

    **A.     Petitioner has a Reasonable Likelihood of Success on the Merits**

    The Petitioner makes a threshold showing of likelihood of success by showing that its chances are "better than negligible."  *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 502; *NLRB v. Electro-Voice*, 83 F.3d at 1568.  In assessing whether the Petitioner has met this burden, a district court must take into account that Section 10(j) confers no jurisdiction to pass on the ultimate merits of the unfair labor practice case, *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 502; *NLRB v. Electro-Voice*, 83 F.3d at 1567, and that, ultimately, the Board's determination on the merits will be given considerable deference, *Bloedorn v. Francisco Foods*, 276 F.3d at 287. In evaluating likelihood of success, it is not a district court's responsibility to rule on the merits of the director's complaint; this is the Board's province.  *Bloedorn v. Francisco Foods*, 276 F.3d at 287.  Rather, a court's inquiry is confined to the *probability* that a petitioner will prevail.  *Id.* (emphasis in original) (citing *Electro-Voice*, 83 F.3d at 1570).  A petitioner satisfies this inquiry by merely demonstrating that he or she has a "better than negligible chance of success" of prevailing on the merits, or, as the Seventh Circuit has also articulated it, by demonstrating that he or she has "'some chance' of succeeding on the merits."  *NLRB v. Electro-*

---

[13]  In *NLRB v. Pioneer Press*, the Seventh Circuit overruled the district court's denial of injunctive relief, in part, because the district court's ruling was predicated on the belief that Section 10(j) relief was reserved for more serious and extraordinary circumstances than were presented to the court.  *Pioneer Press*, 881 F.2d at 493.  The Seventh Circuit noted that deference should be afforded to the Board in its selection of cases meriting Section 10(j) relief and prosecutorial decision making should not be undertaken by the district court.  *Id.*

*Voice*, 83 F.3d at 1568 (citing *Kinney v. International Union of Operating Engineers, Local 150, AFL-CIO*, 994 F.2d 1271, 1279 (7th Cir. 1993)) (other citation omitted).

When a district court decides a petitioner's request for injunctive relief entirely on a paper record, the petitioner is entitled to a favorable construction of the evidence, much as if the petitioner were appealing the grant of summary judgment in favor of the defendant. *Bloedorn v. Francisco Foods*, 276 F.3d at 287 (citing *Pioneer Press*, 881 F.2d at 489; *Electro-Voice*, 83 F.3d at 1566 n. 15). In this circumstance, a petitioner's factual averments should be credited so long as they are plausible in light of the record evidence. *Bloedorn v. Francisco Foods*, 276 F.3d at 287 (citing *Electro-Voice*, 83 F.3d at 1570). The Seventh Circuit has declined to articulate a rule as to how facts should be viewed in other circumstances. *Bloedorn v. Francisco Foods*, 276 F.3d at 287 n. 9. The Court has noted that other circuits have often observed that a petitioner is entitled to favorable construction of the evidence; however, the Court further noted that this observation has usually been made in cases involving the "reasonable cause" standard. *Id.*

Further, a district court should not resolve credibility conflicts, but rather focus on whether a director's evidence is sufficient to show a better than negligible chance of success on the merits. *See NLRB v. Electro-Voice*, 83 F.3d at 1570 (acknowledging that there were credibility questions regarding both the director's and the respondent's witnesses, but it was not in the Court's purview to decide credibility issues, as this would go to the merits of the case); *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 25 (1st Cir. 1986). *See also Kobell v. United Paperworkers Int'l. Union*, 965 F.2d 1401, 1407 (6th Cir. 1992).

With regard to interpretation of the law, the Seventh Circuit has held that district courts must be "hospitable" to a director's view of the law. *Bloedorn v. Francisco Foods*, 276 F.3d at 287 (citing *California Pacific Medical Center*, 19 F.3d at 460, which quotes *Danielson v. Joint*

*Bd. Of Coat, Suit, & Allied Garment Workers Union*, 494 F.2d 1230, 1245 (2d Cir. 1974) (Friendly, J.) ("Even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel.")).  This holding is predicated on the Court's understanding that it is the Board, not the district court, which is charged with the administration and enforcement of the Act and that a district court's role is necessarily limited given the Board's expertise in matters of labor relations.  *Bloedorn v. Francisco Foods*, 276 F.3d at 287.

In this case, the Petitioner has a strong likelihood of success of showing that Respondent violated Sections 8(a)(1), (3), and (5) of the Act when it unilaterally reduced 19 bargaining unit employees from full-time to part-time status without providing the Union with prior notice and an opportunity to bargain, which later caused four of the affected employees to resign.  Sections 8(a)(5) and 8(d) of the Act oblige an employer to bargain with the representative of its employees in good faith with respect to "wages, hours and other terms and conditions of employment."  *NLRB v. Borg-Warner Corp.*, 356 U.S. 342 (1958); *Fiberboard Corp. v. NLRB*, 379 U.S. 203 (1964).

Section 8(a)(5) of the Act also obligates an employer to notify and consult with a union concerning changes in wages, hours, and conditions of employment before imposing such changes without first giving the union an opportunity to bargain about them. *NLRB v. Katz*, 369 U.S. 736 (1962).  See also *Spurlino Materials, LLC v. NLRB*, 645 F.3d 870, 879-80, 882-83 (7th Cir. 2011) (employer violated 8(a)(5) by unilaterally creating new job classifications, implementing new employee evaluation system to assign employees to those new jobs, and subcontracting unit work); *NLRB v. Parents & Friends of the Specialized Living Center*, 879 F.2d 1442, 1447, 1455-57 (7th Cir. 1989) (finding unlawful unilateral changes to work schedules that reduced number of hours worked); and *NLRB v. Pinkston-Hollar Construction Services*, 954

F.2d 306 (5th Cir. 1992). The Board has held that the hours and/or particular days bargaining unit employees work is a mandatory subject of bargaining. *Palm Beach Metro Transportation, LLC*, 357 NLRB No. 26 (July 26, 2011); *Eugene Iovine, Inc.*, 328 NLRB 294 (1999); *Carpenters Local 1031*, 321 NLRB 30, 31 (1996). Absent a "clear and unmistakable" waiver, an employer's failure to provide the union with prior notice and an opportunity to bargain over unilateral changes to the hours and/or days unit employees work violates Section 8(a)(5). See *Mid-Continent Concrete*, 336 NLRB 258, 259 (2001), enfd. 308 F.3d 859 (8th Cir. 2002). See also *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983).

For the notice to be timely it must allow the union a reasonable opportunity to evaluate the proposal or intended actions and present a counterproposal or alternative actions before the change at issue is implemented or takes place. See e.g., *M & M Contractors*, 262 NLRB 1472 (1982); *Ciba-Geigg Pharmaceutical Division*, 264 NLRB 1013 (1982). To be timely, the notice must be given sufficiently in advance of actual implementation of the change to allow a reasonable opportunity to bargain. *Ladies Garment Workers Union (McLaughlin Mfg. Corp.) v. NLRB*, 463 F.2d 907 (D.C. Cir. 1972); *Medicenter Mid-South Hospital*, 221 NLRB 670 (1975). The Board has held that notice of less than a week does not constitute prior notice. See *M. A. Harrison Mfg.*, 253 NLRB 675, 676 (1980), enfd. 682 F.2d 580 (6th Cir. 1982) (a 3-day interval between an employer's announcement of and subsequent institution of unilateral changes were held to be inadequate to give the union an opportunity to bargain and hence was an insufficient defense to an 8(a)(5) violation).

There is no dispute that Respondent failed to provide the Union with prior notice or opportunity to bargain over its reduction of the 19 full-time employees to part-time status, and/or the consequences of those reductions of the employees' wages, hours or other terms and

conditions of employment, prior to the implementation of the reductions on around September 18, 2011. Respondent's representatives consistently acknowledged that fact to the Union during negotiations and to the Petitioner during the investigation into the unfair labor practice charges. While Respondent mentioned to the Union during a January 2011 meeting that the Festival Foods store was going to be opening a competing grocery store a few miles from the Sheboygan store, Respondent never notified the Union that the opening of the Festival Foods store would or could result in full-time bargaining unit employees being reduced to part-time status.

Although Respondent does not dispute it did not provide the Union with prior notice or an opportunity to bargain over these reductions, it has offered various, shifting defenses for why it was not obligated to do so. Each defense should be rejected as having no merit. First, Respondent argued it did not have an obligation to provide the Union with prior notice or an opportunity to bargain over the reductions because the changes at issue were permitted under the management-rights clauses in the parties' collective-bargaining agreements. The agreements, however, expired on September 7, 2011--a week before the changes at issue were made. Absent evidence of the parties' contrary intention, contractual waivers do not survive the expiration of the contract. See *E.I. Dupont de Nemours*, 355 NLRB No. 176, slip op. at 3 (August 27, 2010); *Long Island Head Start Child Development Center*, 345 NLRB 973 (2005), enf. denied on other grounds, 460 F.3d 254 (2nd Cir. 2006). See also *Local 65-B, Graphic Communications Conference of the International Brotherhood of Teamsters v. NLRB*, 572 F.3d 342 (7th Cir. 2009). In this case, the parties never agreed, orally or in writing, to extend the terms of the collective-bargaining agreements. As a result, the management-rights provisions, as well as any other contractual waiver, expired with the agreements on September 7, 2011, and Respondent

cannot rely upon those expired provisions as a defense to its failure or refusal to provide the Union with prior notice and an opportunity to bargain over the unilateral reductions at issue.

When faced with the above established precedent, Respondent changed its position and began arguing that the reductions at issue were lawful because they were consistent with its past practice. The Board has held if the alleged "change" is consistent with past practice and actually preserves the status quo, then the employer is not obligated to provide notice and an opportunity to bargain. *Courier-Journal*, 342 NLRB 1093 (2004). In *Courier-Journal*, the Board found that the employer's alleged unilateral changes in its health insurance program were implemented lawfully pursuant to a "longstanding," ten-year practice of annual changes to benefits and premiums under the parties' successive contracts and during hiatus periods between contracts. That practice developed under a contractual clause requiring the employer to continue a health insurance program for unit employees on the same terms in effect for unrepresented employees. The contract further provided that any changes in benefits and premiums for the represented employees had to be "on the same basis" as for the unrepresented employees. The Board expressly noted that "[t]he significant aspect of this case" was that the union had acquiesced to a past practice of tying premiums and benefits for unit employees to those of non-unit employees. Therefore, the Board concluded that the changes at issue in *Courier-Journal* were actually a continuation of the status quo--maintenance of a health insurance program for unit employees that matched the program afforded non-unit employees--and did not violate Section 8(a)(5).

More recently, in *Caterpillar, Inc.*, 355 NLRB No. 91 (August 17, 2010), the Board clarified that "making a series of disparate changes without bargaining does not establish a 'past practice' excusing bargaining over future changes." Instead, any asserted past practice of unbargained changes must be demonstrated by a showing of such "regularity and frequency" that

the employees could reasonably expect the practice to continue. Moreover, there must be "a thread of similarity running through and linking the several types of change at issue[.]" In *Caterpillar, Inc.*, the employer changed its prescription drug program on separate occasions, without objection from the union, to require preauthorization for certain prescriptions, to limit quantities on prescriptions for certain drugs, and to institute "step therapies" for certain drug families requiring that over-the-counter medication be tried first. The Board found that the union's prior acquiescence to these changes did not establish a practice permitting the employer's implementation of a "generic first" requirement. Instead, the Board relied upon longstanding precedent to hold that the union's acquiescence to prior unilateral changes did not waive its right to bargain over future changes in such terms. In so doing, the Board held that the change at issue represented a material departure from the prior changes.[14]

Under Board law, Respondent has the burden of proof to demonstrate that the past practice at issue occurred with such regularity and frequency that employees could reasonably expect the practice to continue or recur on a regular and consistent basis. See *Caterpillar, Inc.,* supra. Respondent initially argued that the reductions at issue were similar, but on a larger scale, to the weekly revisions the managers are required to make to the work schedule in order to respond to business needs. Respondent did not provide specifics as what these weekly revisions actually are. But Respondent has not presented evidence that these weekly changes regularly or consistently resulted in full-time employees being reduced to part-time employees.

---

[14] In *Palm Beach Metro Transportation, LLC*, 357 NLRB No. 26 (July 26, 2011), the employer unilaterally reduced the hours of work offered to employees based upon various changes affecting the business, without providing the union with notice and an opportunity to bargain. One of the arguments the employer raised was that it was privileged to make the changes because it was following an established past practice, and maintaining the status quo. The ALJ found, and the Board later affirmed, that the employer failed to present evidence of long-term past practice of making these types of changes, or that the union (which had just been certified) ever acquiesced to such changes. As a result, the Board found the changes violated the Act.

Later, Respondent cited to one instance in which it reduced two or three full-time employees to part-time status at its Store 15. This situation occurred in 2010, when Respondent sold its other Sheboygan store (Store 31), and it met with the Union regarding what to do with the employees working at the store. Although Respondent failed to provide the Union with requested information, the parties met and, pursuant to the terms of the collective-bargaining agreements in effect, certain of the affected employees from the store being sold bumped into positions at Store 15, which resulted in three full-time deli employees already working at Store 15 being bumped into part-time positions. There are several differences between what is occurring now and what occurred in 2010. First, and foremost, in 2010, Respondent and the Union met about the reductions before they were made. Second, in 2010, Respondent reduced three employees, all in the deli department. In the present situation, Respondent reduced *19* full-time employees (or more than 35 percent of the full-time work force), in various classifications and in various departments throughout the store. Third, the 2010 reduction of the three deli employees to part-time status occurred while the contract was in effect. In the present case, the reductions occurred after the agreements expired and while the parties were preparing to commence negotiations over successor agreements. See *E.I Dupont De Nemours*, 355 NLRB No. 176 (August 27, 2010)(Board draws distinction between changes during life of contract with a management rights provision versus changes made after contract expired).

Respondent, therefore, has failed to meet its burden of establishing that it has engaged in a past practice of reducing employees from full-time to part-time with such regularity and frequency that the Union and employees could reasonably expect the practice to continue or recur on a regular and consistent basis.

As a result, Respondent has failed to present a legitimate defense to its unlawful failure or refusal to provide the Union with notice and an opportunity to bargain over the reductions at issue, in violation of Sections 8(a)(5) and (1) of the Act [29 U.S.C. §158(a)(5) and (1)].

Section 8(a)(3) of the Act prohibits an employer from discriminating in regard to hire or tenure or terms and conditions of employment of its employees to discourage membership in any labor organization. The Board, with the approval of appellate courts, has held that an employer who unlawfully conditions employment on conditions unilaterally established by an employer in derogation of the employees' statutory right to union representation creates intolerable working conditions, and an employee who resigns in response to such conditions is deemed to be constructively discharged, in violation of Sections 8(a)(3) and (1) of the Act, even in the absence of independent animus. *See Control Services, Inc.,* 303 NLRB 481, 484-85 (1991), *enfd mem.* 975 F.2d 1551 (3d Cir.1992). See also *Canteen Corp. v. NLRB*, 103 F.3d 1355; 1365-66 (7th Cir. 1997); *NLRB v. Haberman Constr. Co.,* 641 F.2d 351, 358 (5th Cir.1981) (en banc); and *RCR Sportswear, Inc.,* 312 NLRB 513, 513 (1993), *enforced without opinion,* 37 F.3d 1488 (3d Cir.1994).

As previously stated, four of the affected employees (Jeffrey Gross, Lauriel Hansen, Laura Hoffmann, and Tina Meinhardt) quit their employment as a result of Respondent's unilateral reduction of their hours of work which caused them to lose pay and certain contractual benefits, including, but not limited to, their health insurance coverage. Since these four employees were faced with a choice between resignation or continued employment conditioned on relinquishment of their Union's right to bargain, as well as concern that Respondent would continue to make further unilateral changes, the evidence establishes they were constructively discharged in violation of Sections 8(a)(1) and (3) of the Act [29 U.S.C §158(a)(1) and (3)].

Overall, the likelihood that the Petitioner will succeed on the merits is very strong.

**B.      There is no Adequate Remedy at Law and Irreparable Harm will result Absent the Imposition of the Injunction.**

There is no adequate remedy at law and irreparable harm will result unless Respondent's unilateral reductions of the 19 full-time bargaining unit employees to part-time status without first providing the Union with notice and an opportunity to bargain is immediately enjoined.  First, there is irreparable harm caused by the loss of health insurance coverage for the reduced employees, their spouses, and their children.  Although not in the context of 10(j) relief, courts have held that loss of health insurance constitutes irreparable harm.[15]  Other courts, however, have required evidence of how loss of coverage would specifically affect individuals adversely.[16]  In the instant case, one employee of the reduced employees can no longer afford his heart medication, and another employee with a history of cancer and ulcers cannot afford any preventive care.  A few of the other affected employees have stated that they have no idea how they will handle their medical care or medication needs, but those who testified stated that because of the loss of insurance combined with the

---

[15] See e.g.,  *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55-59 (2d Cir. 2004); *International Assn. of Machinists & Aerospace Workers v. Trans World Airlines, Inc.*, 601 F. Supp. 1363, 1371-72 (W.D. Mo. 1985); *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2nd Cir.1979) ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury"); *United Steelworkers of America v. Ft. Pitt Steel Casting, Div. of Conval-Penn, Inc.,* 598 F.2d 1273, 1280 (3rd Cir.1979); *American Federation of Government Employees v. Callaway,* 398 F.Supp. 176, 194 n. 3 (N.D.Ala.1975) (in dicta, "loss of broad-form medical-hospital insurance" is irreparable harm); *Texaco Independent Union of Coraopolis Terminal v. Texaco, Inc.,* 452 F.Supp. 1097, 1107 (W.D.Pa.1978) ("the suspension of health insurance protection could cause serious injury to employees that could not be remedied through arbitration").

[16] See *Morgan v. Fletcher,* 518 F.2d 236, 240 (5th Cir.1975) (loss of health insurance not to constitute irreparable harm when need for health services was only "conjectural"); *Gonzalez v. Chasen,* 506 F.Supp. 990, 999 (D.P.R.1980) (loss of health insurance coverage constitutes irreparable harm where existing health issues documented); See also *Local Union No. 884, United Rubber, Cork, Linoleum & Plastic Workers v. Bridgestone/Firestone,* 61 F.3d 1347, 1354 (8th Cir.1995).

significant loss of hours, they will not be able to purchase health insurance for themselves and their families.  A final Board order that reimburses employees for medical expenses cannot fully remedy the harm to employees who are currently unable to afford adequate medical treatment for themselves or their families and, thus, must either postpone or forego such treatment.  The courts have recognized in similar situations that the loss of medical benefits during litigation constitutes irreparable harm.[17]  As such, interim rescission of the unilateral change here is equitably necessary to prevent the irreparable harm resulting from the unit employees losing their health insurance.

Second, the courts have long recognized that "enforcement of the obligation to bargain collectively is crucial to the statutory scheme."  *NLRB v. American National Ins. Co.*, 343 U.S. 395, 402 (1952).  The "refusal of an employer to bargain collectively with the employees' chosen representative disrupts the employees' morale, defers their organizational activities and discourages their membership in unions."  *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 703 (1944); See also *Bloedorn v. Francisco Foods, Inc.*, supra.  In the instant case, the evidence establishes that the reductions themselves have undermined employee morale and support for the Union.  Several of the affected employees testified that because of these changes they view the Union as being ineffective and that the Union cannot do anything to stop Respondent from continuing to make similar unilateral changes to their wages, hours and other terms and conditions of employment in the future.  This concern is

---

[17] See *Blyer v. Jung Sun Laundry Group Corp.*, 2010 WL 4722286, at *9 (E.D.N.Y. November 15, 2010) (noting need for 10(j) relief requiring employer to temporarily reinstate illegally discharged strikers because of their loss of healthcare coverage); *Mattina v. Kingsbridge Heights Rehab. & Care Center*, 184 LRRM 3060, 3085 & n.62, 2008 WL 3833949, at *25 & n.62 (S.D.N.Y. 2008) (noting need for 10(j) relief requiring employer to resume contractual health fund contributions was "tragically obvious"), affd. 329 Fed. Appx. 319, 2009 WL 1383330 (2d Cir. 2009).  See generally *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d at 570 (loss of employee benefits "sufficient to establish irreparable harm").

validated by Respondent's continued statements that it will make further reductions based on an anticipated drop in sales, again without bargaining with the Union over the decision to make these reductions, even though a hearing is scheduled over the reductions done last September. (Exhibits 15 and 16) It also is validated by Respondent's continued lack of respect for its statutory obligation to bargain with the Union, as demonstrated by its January 2012 decision to bypass the Union and deal directly with one of the constructively discharged employees by offering to rehire her, but with different wages, hours, and other terms and conditions of employment.

Moreover, as previously stated, four of the affected employees have quit as a result of their reduction in hours and loss of wages and contractual benefits, and several others have stated or heard others state that they too will be looking for other employment following the unilateral reductions. Add to this Respondent's postings and statements following the reductions in which it denigrated the Union and attempted to blame the Union for the reductions, and there is no dispute that there would be irreparable harm if an injunction is not issued. (Exhibits 10 and 11). Furthermore, absent injunctive relief, the passage of time reasonably necessary to adjudicate the unfair labor practice charges will destroy the effectiveness of the ultimate remedial power of the Board by irretrievably dissipating employee support for the Union.

In *Winter v. Natural Res. Def. Council*, supra, the Supreme Court required "plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." In this case, the above evidence establishes irreparable harm is not only likely, it is already occurring with the erosion of employee support for the union and the scattering of employees as result of the unilateral reduction of hours.

Finally, the unilateral changes at issue occurred while the parties are in the process of commencing negotiations over successor agreements. Unilateral changes strike at the heart of a union's ability to represent employees by allowing an employer to enjoy the fruits of its unlawful conduct and to gain an undue bargaining advantage, leaving the union to bargain from inside a hole. See *The Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), enf'd 414 F.2d 1084 (8th Cir. 1969); *Herman Sausage Co.*, 122 NLRB 168, 172 (1958), enf'd 275 F.2d 229 (5th Cir. 1960). See also *NLRB v. Katz*, 369 U.S. at 744 (unilateral changes frustrate the statutory objective of establishing working conditions through collective bargaining). Thus, interim rescission of Respondent's unilateral changes is necessary to allow the parties to engage effectively in good faith collective bargaining while the unfair labor practice case is pending before the Board. Interim rescission restores a level playing field to the parties' collective bargaining relationship. Otherwise, Respondent can use restoration of the working conditions as "bargaining bait" to force acceptance of its bargaining proposals. See *Southwest Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988)(restoration of status quo ensures "meaningful bargaining"); *Florida-Texas, Inc.*, 203 NLRB 509, 510 (1973), enf'd 489 F.2d 1275 (6th Cir. 1974)(unremedied unilateral subcontracting impedes the parties' bargaining process). Unilateral changes "must of necessity obstruct bargaining, contrary to congressional policy." See *NLRB v. Katz*, 369 U.S. at 747. Thus, an interim rescission order is necessary for the parties to effectively engage in good-faith bargaining while the unfair labor practice case is pending before the Board.[18]

---

[18] See *Silverman v. Major League Baseball Player Relations Committee, Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.) (interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations), affd. 67 F.3d 1054, 1062 (2d Cir.

An interim rescission order is necessary in this case to curb the significant loss of employee support for the Union caused by the unilateral changes, which is a harm that an eventual Board order likely cannot remedy. As previously stated, Respondent's unilateral conversion of the 19 unit employees to part-time status has caused four of those employees to resign and other unit employees to consider finding new jobs because they fear Respondent will unilaterally change their employment terms as well. Equally important, Respondent's unlawful conduct has generated a significant amount of employee discontent with the Union and eroded its "prestige and legitimacy" among the employees, who now believe that the Union has not provided them with effective representation.[19] Part of that has been caused by Respondent's postings denigrating the Union. (Exhibits 10 and 11) Such feelings are exacerbated here by the fact that Respondent is a recidivist with a history of bargaining in bad faith with the Union.[20] By the time the Board issues its final order, the unit employees will be far less likely to continue supporting the Union after being subjected to Respondent's unilateral changes, or believing that they could be subject to such

---

1995). See also *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980); *Overstreet v. El Paso Disposal, L.P.*, 668 F. Supp. 2d 998, 1015 (W.D. Tex. 2009) (ordering rescission of unilateral changes "[t]o best promote conditions for collective bargaining, [and] effectuate the purposes of the Act"), affd. as modified 625 F.3d 844 (5th Cir. 2010); *Kobell v. United Refining Co.*, 159 LRRM 2762, 2767-68, 1998 WL 794860, at *8 (W.D. Pa. 1998) ("by rescinding the unilateral changes in the working conditions described above, we even the playing field to permit collective bargaining to proceed in the correct atmosphere of a good faith intent to reach an agreement"); *Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997).

[19] *Morio v. North American Soccer League*, 632 F.2d at 218. See also *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1201 (D. Haw. 2010) (noting that unilateral changes "send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them"), affd. sub nom. *Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011); *NLRB v. Hardesty Co., Inc.*, 308 F.3d 859, 865 (8th Cir. 2002) (same).

[20] See footnote 3.

changes.[21]   An incumbent union needs the support of the employees it represents to effectively represent them.[22]   Ordering Respondent to temporarily rescind the unilateral change now, before it is too late, offers the best chance of restoring and preserving the Union's support, preserving the employees' choice of the Union, and preserving the effectiveness of a final Board decision ordering Respondent to rescind the unilateral reductions, restore the status quo, and bargain in good faith with the Union.

### C.      Balancing the equities favors the granting of the injunction against Respondent.

The irreparable harm to be avoided in a Section 10(j) case is the threatened frustration of the remedial purpose of the Act and of the public interest in deterring continued violations. *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976), cited with approval in *Kinney v. Pioneer Press*, 881 F.2d at 491.[23]   In evaluating whether irreparable injury to the policies of the Act is threatened, as well as in balancing such harms against any

---

[21] Cf. *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26-27 (1st Cir. 1986) (in granting interim *Gissel* bargaining order, court stated "[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining") (quoting *Electrical Workers v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir.), cert. denied 400 U.S. 950 (1970)).

[22] Cf. *Moore-Duncan v. Horizon House Developmental Services*, 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001) (where employer unlawfully withdrew recognition from incumbent union, court granted interim bargaining order noting that without employee support, union has little leverage and "will be hard-pressed to secure improvements in wages and benefits at the bargaining table").

[23] *NLRB v. Electro-Voice* notes that when equitable relief is the ultimate relief sought, an additional element "no adequate remedy at law" is part of traditional equity analysis for which petitioner must show that an award of damages would be "seriously deficient." 83 F.3d at 1567, quoting *Roland Machinery Co. v. Dresser Industries*, 749 F.2d at 386-87.  As here, a Board proceeding resulting in permanent injunctive relief is the sole avenue of relief for conduct made unlawful under the National Labor Relations Act.  Thus, in Section 10(j) cases, the "adequate remedy at law" inquiry is whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final judgment.  *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d at 386.  This inquiry effectively is the same as the question of "irreparable harm" to the petitioner.  *NLRB v. Electro-Voice*, 83 F.3d at 1572-53.

threatened harm to the respondent or the public interest, the district court must "take into account the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Miller v. California Pacific*, 19 F.3d 449, 460 (9th Cir. 1994), citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Accord: *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 455 (1st Cir. 1990) (Section 10(j) relief is appropriate whenever the circumstances create a reasonable apprehension that, absent an injunction, the efficacy of the Board's final order may be nullified or frustrated during regular Board litigation). "In appropriate circumstances, the same evidence that establishes the Director's likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm." *Bloedorn v. Francisco Foods*, 276 F.3d at 297-98. "[T]he interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process.'" *Id*. at 300, quoting *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906-07 (3d Cir. 1981).

In the instant case, balancing the threatened hardships favors the grant of interim injunctive relief. The imposition of cease and desist and bargaining orders, pending the Board's final order, would not be unduly burdensome on Respondent. There is little risk of harm to Respondent from having to rescind the unilateral change. There is strong evidence that Respondent violated the Act by making the unilateral change and, therefore, that the Board is likely to ultimately grant the same relief as sought here. Further, there is no evidence that interim relief will cause Respondent financial harm. Respondent's claim that an interim rescission order will cause it financial harm that could lead to reduced hours or layoffs for additional employees is undermined by the fact that it hired several new part-time employees after making the unilateral change involved here, particularly when Respondent

initially claimed that labor costs were not a factor in its prior decision to reduce the 19 full-time employees to part-time status. In any event, courts routinely grant Section 10(j) injunctions that impose financial costs on an employer.[24] Moreover, the risk of erroneous interim relief, small in this case, is present in all Section 10(j) proceedings as a risk of "carrying out sound labor law policy."[25]

Moreover, an interim bargaining order under Section 10(j) does not last forever.[26] The bargaining order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Rather, it only requires bargaining with the Union in good faith to an agreement or a bona fide impasse.[27] Any agreement reached between the parties under a Section 10(j) decree can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy.[28] The costs in terms of time and money spent on collective bargaining is a burden that falls on both parties and thus does not defeat a request for an interim bargaining order.[29]

Also, in balancing the need for interim reinstatement of the four constructively discharged employees, it is well settled that the Section 7 rights of alleged discriminatees to

---

[24] See, e.g., *Small v. Southern California Permanente Medical Group*, 189 LRRM 3025, 3026-27, 2010 WL 5509922, at *1-*2 (C.D. Cal. 2010) (requiring respondent to grant annual wage increase on prospective basis); *Aguayo v. South Coast Refuse Corp.*, 161 LRRM 2867, 2879, 1999 WL 547861, at *16 (C.D. Cal. 1999) (requiring respondent to comply with terms of agreed upon contract on an interim basis); *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. at 261 (ordering respondents to reinstitute the unilaterally abolished salary arbitration and free agency system existing under the parties' expired labor contract).

[25] *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980).

[26] See *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975)("there is nothing permanent about any bargaining order... particularly an interim order which will last only until the final Board decision").

[27] See *Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers*, 88 F. Supp. 935, 943 (D. D.C. 1950).

[28] See, e.g., *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1054.

[29] See *Scott v. Stephen Dunn & Associates*, 241 F.3d 652, 669 (9th Cir. 2001).

interim reinstatement under Section 10(j) outweighs the mere job rights of the workers hired or reassigned to replace them.[30]  Once reinstated, Respondent would also benefit from the work of these experienced employees.[31]   Interim reinstatement also will not restrict Respondent's entrepreneurial right to discipline its employees in a nondiscriminatory fashion where appropriate.[32]  At the same time, the need for interim relief is not undercut by the fact that three of the four constructively discharged employees have informed the Region that they are currently not interested in reinstatement with Respondent.  An order requiring Respondent to offer those individuals interim reinstatement is equally for the benefit of the remaining employees who have lost support for the Union because they feel it cannot provide them with effective representation. If any of the four discriminatees decide not to return to the units, it will be their own decision and not because of Respondent's unlawful conduct.  Moreover, they should have the benefit of considering an offer of interim reinstatement under the protection of a Section 10(j) order.[33]

Absent this injunctive remedy, the administrative remedies would be insufficient to restore the status quo ante over the passage of time.  In the instant case, should the interim order be granted, the imposition of a cease and desist remedy to restore the status quo would require nothing more than for Respondent to obey the law.  Petitioner is seeking nothing more than an

---

[30] See *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 299-300; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988) (citing *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 959-60 (1st Cir. 1983)).

[31] See *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981); *Scott v. Pacific Custom Materials, Inc.*, 939 F. Supp. 1443, 1456-57 (N.D. Cal. 1996).

[32] See *NLRB v. Electro-Voice, Inc.*, 83 F.3d at 1573.  See also *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001); *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d at 906.

[33] See *Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161, 1166 (E.D. Mich. 1979) (requiring employer to make interim reinstatement offers even though it allegedly had previously offered reinstatement to discriminatees; "[w]hen a company's action creates an atmosphere inhospitable to union adherents they may be reluctant to once again subject themselves to those conditions"), affd. mem. 615 F.2d 1360 (6th Cir. 1980).

order that would give the affected employees the contract benefits to which they are entitled. Furthermore, given the clarity of demonstrating the "likelihood of success on the merits" the "Director need not demonstrate that the harm to the labor effort outweighs the harm to the employer. . . ." *NLRB v. Electro-Voice*, Inc., *supra*.

>    D.    **The Public Interest Necessitates Issuance of 10j Injunction.**

There is substantial public interest in granting interim relief. Issuing the injunction would maintain the Board's effectiveness, ensure that employees will be able to exercise their Section 7 rights, and facilitate the collective-bargaining process. The grant of temporary injunctive relief also serves the public interest by ensuring that the unfair labor practices do not succeed. To the extent that an interim order would promote industrial peace and prevent unwarranted labor unrest, it is "just and proper" under Section 10(j) for the district court to grant injunctive relief herein. See *Kinney v. Pioneer Press*, 881 F.2d at 483 ("If [the Employer] has wrongly refused to recognize and bargain with [the Union]…the court should enjoin these activities"); *Moran v. LaFarge*, 286 F.Supp.2d. 1002, 1016 (N.D. Ind. 2003)("Granting a temporary injunction would serve the public interest because it would ensure the employees will be able to exercise their Section 7 rights and facilitate the collective bargaining process."). Interim relief preserves the remedial power of the Board, protects the employees' Section 7 rights, and safeguards the parties' collective-bargaining process.[34]

Finally, Respondent may claim as a defense that the Union is responsible for the effect the unfair labor practices have had on the parties' bargaining relationship, because the Union has

---

[34] See, e.g., *Lineback v. Spurlino Materials, LLC*, 546 F.3d at 502; *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 300 ("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process' … [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices").

declined to continue negotiations over successor agreements until Respondent restores the status quo and bargains over the September reductions. Any potential defense by Respondent that the Union's alleged conduct at or away from the table renders injunctive relief against it inappropriate misses the mark regarding the need for a preliminary injunction requiring interim rescission of the changes involved here. First, the Union's alleged conduct is irrelevant to the issue of whether Respondent engaged in bad-faith bargaining by making the unilateral changes. Second, even if the Union's alleged conduct were to be considered relevant to the just and proper analysis, courts have rejected the "unclean hands" defense in Section 10(j) cases because the Board seeks to protect the public interest and the Section 7 rights of employees, not that of the Union, when petitioning for Section 10(j) relief.[35] Finally, the Union's conduct may be based on its inability to get Respondent to move off of its unilateral change during bargaining. Interim rescission of the unilateral change will place the parties in a position where they can start anew to engage in meaningful bargaining.[36]

## V.    CONCLUSION

Based on the foregoing, Petitioner submits the evidence adduced in support of the underlying unfair labor practices clearly demonstrates a strong likelihood of success on the merits of the Regional Director's administrative complaint allegations involving Respondent's violations of Sections 8(a)(1), (3) and (5) of the Act. The immediate and substantial threat to the Board's processes, the collective-bargaining relationship, and the

---

[35] See *D'Amico v. United States Service Industries. Inc.*, 867 F. Supp. 1075, 1080, 1087 (D. D.C. 1994) (rejecting unclean hands defense where union had engaged in three incidents of violence). See also *Henderson v. Operating Engineers Local 701*, 420 F.2d 802, 808 (9th Cir. 1969) (rejecting unclean hands defense in Section 10(*l*) case).
[36] Cf. *Penello v. United Mine Workers*, 88 F. Supp. 935, 942 (D. D.C. 1950) (although interim bargaining order cannot guarantee parties will reach agreement, it will remove unlawful impediment to bona fide bargaining).

rights of employees to maintain a relationship with their bargaining representatives far outweighs any potential burden on Respondent that Petitioner's request for interim relief would impose. Thus, 10(j) relief is just and proper. Wherefore, Petitioner prays that this Court grant the temporary injunctive relief requested in the Petition pending the Board's final administrative adjudication of the matters currently before it.[37]

Dated at Milwaukee, Wisconsin, this 14th day of February, 2012.

Respectfully submitted,

*/s/ filed electronically*
Andrew S. Gollin
Counsel for Petitioner
National Labor Relations Board, Region 30
310 West Wisconsin Avenue, Suite 700W
Milwaukee, Wisconsin 53203
(414) 297-3867

*/s/ filed electronically*
Renee Medved,
Counsel for Petitioner
National Labor Relations Board, Region 30
310 West Wisconsin Avenue, Suite 700W
Milwaukee, Wisconsin 53203
(414) 297-3870

---

[37] The 10(j) decree will terminate by operation of law upon the issuance of the Board's decision and order in the unfair labor practice case. See *Barbour v. Central Cartage, Inc*., 583 F.2d 335, 337 (7th Cir. 1978).