UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

IRVING E. GOTTSCHALK,
Regional Director of the Thirtieth Region of the
National Labor Relations Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

        Plaintiff,

        v.                          Case No. 12-C-0152

PIGGLY WIGGLY MIDWEST, LLC,

        Defendant.

---

DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND
GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

        This case came before the court on the verified petition of Irving E. Gottschalk, Regional Director of the Thirtieth Region of the National Labor Relations Board (Board) for preliminary injunction pursuant to Section 10(j) of the National Labor Relations Act, as amended [61 Stat. 149; 73 Stat. 544; 29 U.S.C. §160(j)] (Act), pending the final disposition of the claims of unfair labor practices now before an administrative law judge. Respondent, Piggly Wiggly Midwest, LLC ("Piggly Wiggly"), responded with a motion to dismiss for lack of subject matter jurisdiction on the ground that petitioner lacks the statutorily required quorum of three members to authorize the filing of the matter before this court. The trial before the administrative law judge was held on February 22 and 23, 2012. Afterward, on March 7, 2012, this court conducted a hearing on petitioner's motion for injunctive relief and respondent's motion to dismiss. Now, after due consideration the court will deny the motion to dismiss and grant the preliminary injunction.

1

# DEFENDANT'S MOTION TO DISMISS

As an initial matter, respondent filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). In considering a motion to dismiss under Rule 12(b)(1), the district court must accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the petitioner's favor. *Transit Exp., Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001). The burden of proof is on the party asserting jurisdiction. *United Phosphorus Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

Respondent asserts that this court lacks subject matter jurisdiction because the petitioner lacks the statutorily required quorum of three members necessary to authorize pursuit of relief in this proceeding. *See* 29 U.S.C. § 160(j). The National Labor Relations Act established the National Labor Relations Board consisting of five members appointed by the President with the consent of the Senate. Three members of the Board constitute a quorum. 29 U.S.C. § 153(a) and (b). On January 4, 2012, when the Board membership dropped to two, President Obama announced his intent to "recess appoint" three individuals to the Board under the Recess Appointments Clause, U.S. Const. Art. II, § cl. 3. According to respondent, the appointments are invalid because the President acted without the Senate's consent and the lack of quorum means a lack of jurisdiction to act as a Board.

Regardless of whether the President's recess appointments were valid, this motion can be resolved on statutory rather than constitutional grounds. The Board delegated to the General Counsel the authority to bring a 10(j) petition in November of 2011. Under that delegation, the Acting General Counsel authorized the action separately. Two district

courts have rejected challenges that mirror the charge by respondent in this case. *See Fernbach ex rel. N.L.R.B. v. 3815 9th Ave. Meat & Produce Corp.*, 2012 WL 992107 at *1 (S.D.N.Y. Mar. 15, 2012); *Paulsen v. Renaissance Equity Holdings, LLC.*, 2012 WL 1033339 at *14 (E.D.N.Y. Mar. 27, 2012).

Respondent argues that the delegation of Section 10(j) petition power to the Acting General Counsel is contrary to the intent and purpose of the statute. Sections 3 and 10 distinguish between powers reserved to the Board unless otherwise provided in the Act and duties that are assignable to the General Counsel. The Board's longstanding practice permitted the General Counsel to file 10(j) petitions "only upon approval of the Board." 15 Fed. Reg. at 6,924 (1950). Alternatively, any delegation made in November of 2011 was nullified when a third member's term expired and the Board lost its quorum on January 3, 2012.

The majority of courts considering these arguments have concluded that district courts may entertain § 10(j) petitions approved by the General Counsel pursuant to the authority granted him by the Board in December 2007. *Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011); *Osthus v. Whitesell Corp.*, 639 F.3d 841 (8th Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 851–52 (5th Cir. 2010); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539–40 (4th Cir. 2009). These courts have held that the Board's valid delegation of 10(j) authority does not lapse when the Board loses its quorum. *See Frankl*, 650 F.3d at 1354; *Osthus*, 639 F.3d at 844; *Overstreet*, 625 F.3d at 853. Only one court has relied on corporate and agency principles to hold that the Board's delegation of its authority to a three-member panel lapsed when the Board lost its quorum. *Laurel Baye*

3

*Healthcare of Lake Lanier v. N.L.R.B.*, 564 F.3d 469, 473 (D.C. Cir. 2009). Respondent contends "the fact that the D.C. Circuit is thus far the only circuit to conclude the Board's loss of a quorum terminates its prior delegations of authority does not by itself mean this conclusion is wrong."

The United States Supreme Court ruled in *New Process Steel LP v. N.L.R.B.*, 130 S. Ct. 2635 (2010), that following a delegation of the Board's powers to a three-member group, two members may not continue to exercise that delegated authority once the group's (and the Board's) membership falls to two. However, the United States Supreme Court in *New Process Steel* declined to address the specific issue at bar: "Our conclusion that the delegee group ceases to exist once there are no longer three Board members to constitute the group does not cast doubt on the prior delegations of authority to nongroup members, such as the regional directors of the general counsel. The latter implicates a separate decision that our decision does not address." *New Process Steel*, 130 S. Ct. at 2642 n. 4.

Recently, the United States District Court for the Eastern District of New York commented on similar delegations of the Board's power to authorize § 10(j) petitions to the General Counsel at various times that the Board anticipated losing its quorum. *Paulsen*, 2012 WL 2044440, at * 8. The first such delegation was in 1993; similar delegations occurred in 2001, 2002, 2007, and 2011. *Id* In finding these delegations proper, the court reviewed the history of the Taft-Hartley Act and found clear congressional intent to allow the Board to delegate prosecutorial tasks – such as its 10(j) powers – to the General Counsel while keeping core adjudicative functions in the Board's domain. *Id.*, at *9-10.

4

The court also ruled that the Board's duly constituted quorum at the time it delegated its § 10(j) powers to the General Counsel did not perpetuate the Board's existence and therefore did not implicate the concerns of the United States Supreme Court in New Process Steel. *Id.*, at \*14. For these reasons, the court finds the delegation of authority to the General Counsel to be valid. Consequently, the motion to dismiss will be denied and the court turns to the issues raised in the request for preliminary injunction.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Section 10(j) of the National Labor Relations Act, 29 U.S.C. §160(j), grants this court the authority to enter injunctive relief as it deems "just and proper." However, an injunction granted under 10(j) is an "extraordinary remedy" and should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011).

Injunctive relief is warranted upon a showing that: (1) the petitioner has no adequate remedy at law; (2) the labor effort will suffer irreparable harm if the injunction is not granted, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) the public interest will be served by granting the injunctive relief; and (4) the petitioner has a reasonable likelihood of prevailing on the merits of his complaint. *Lineback v. Spurlino Materials, Inc.*, 546 F.3d 491, 500 (7th Cir. 2008); *N.L.R.B. v. Electro–Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996). The final requirement does not ask the court to pass on the merits of the underlying case; rather, the court evaluates only on a preliminary

5

basis the petitioner's probability of success before the Board. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 287 (7th Cir. 2001).

Facts

These findings rest on a review of the record and evidence discussed during oral argument. Respondent, Piggly Wiggly Midwest, LLC, is a wholesaler of grocery, meat and produce to franchise stores and an operator of corporate retail grocery stores with places of business throughout the Midwest, including a store located at 3124 South Business Drive, Sheboygan, Wisconsin ("Store 15"). (G.C. Exs. 1(g) and 1(u)).

United Food and Commercial Workers Union, Local 1473 ("Union"), is the exclusive collective-bargaining representative for a unit of retail clerks and unit of meat department employees at Store 15. The following persons have been supervisors for the respondent: Paul Butera (Owner); John Braunreiter, Jr. (District Manager); Daniel Holtz (Sheboygan Store Manager); and Mary Zenisek (Manager of Retail Services Operations). (*Id.*)

After assuming ownership of Store 15 in 2007, respondent recognized the Union as the exclusive representative of the employees while assuming the collective bargaining agreements that were in effect at the time the store was acquired. Respondent and the Union bargained and ratified successor collective bargaining agreements that were effective May 7, 2009, to September 7, 2011. (Jt. Exs. 1 and 2.)

On June 27, 2011, the Union requested to commence negotiating the successor agreements for Store 15. (G.C. Exs. 18-19; Tr. of the Official Report of Proceedings before the National Labor Relations Board, Case No. 30-CA-06117, 30-CA-073311, 308:18-24.) However, the agreements expired without the parties extending the terms of their respective contracts. Zenisek, the Retail Services Operations Manager, returned from a

6

vacation to attend a September 12, 2011, negotiation session with the Union for another store but the Union did not attend that bargaining session. (Tr. 431:5-9.)

On September 13, 2011, Holtz and Braunreiter notified 19 bargaining unit employees that they were being reduced from full-time to part-time status effective September 18, 2011. (Tr. 61:3-8; 74:7-75; G.C. Exs. 3, 4, 80-98.) Holtz and Braunreiter cited the opening of a nearby Festival Foods store, and the employer's projections for a drop in sales at Store 15. (Tr. 76:10-17; G.C. Exs. 104 and 115.) These reductions were without prior notice to the Union or the opportunity to bargain over them. (Tr. 75:6-8.)

Meanwhile, frustrated that the Union did not show up for the negotiations and that the Union was not coming to Store 15 (Tr. 431:5-22), Zenisek wrote the following letter to John R. Eiden, President of the UFCW 1473, on September 15, 2011:

> Dear Mr. Eiden:
>
> As you may or may not know, the Company was forced to reduce the hours of some employees at Store #15 in Sheboygan today in anticipation of the opening of a nearby Festival Foods Store. The reduction in hours is required because it anticipated that the Festival Foods Store will absorb a sizeable portion of Piggly Wiggly's sales in that region.
>
> Understandably, the affected employees were concerned about their reduction in hours and reached out to the Union to voice their questions and concerns. Unfortunately, Grant Withers informed the employees that he did not have the time to address their concerns. Needless to say, employees were incredibly upset to hear that the Union was too busy to help them.
>
> Frankly, the Company is concerned with the Union's lack of support for our employees. Rather than leaving the employees hung out to dry, the Company will be holding an informational meeting for the employees to address their questions and concerns.
>
> If you have any further questions please do not hesitate to call me directly.

(Jt. Ex. 3.) There is evidence that Zenisek posted the letter on a bulletin board visible to all employees in Store 15. (Tr. 83:5- 84:2; 210:18-21; 245:10-247:17.)

On September 19, 2011, Eiden, the Union President, responded to Zenisek's letter stating that the Union members were disturbed by the employer's actions to reduce hours, take home pay, health insurance, and pension benefits. (Jt. Ex. 41.) He also stated that "Paul Butera is destroying the lives of the people who work for him. The Union will continue to fight Mr. Butera's attempts to drive his workers into poverty." (*Id.*) Eiden requested information in his letter, including a complete list of affected employees, and a telephone contact for each employee. (*Id.*)

On September 20, 2011, Zenisek refused to provide the telephone numbers maintaining that the Union had that information inasmuch as all employees are required to complete a Union membership application with their phone number listed. (Jt. Ex. 42.) She responded separately to Eiden on September 22, 2011, with the following letter:

> … Shame on you! It is true that the Employer has the right under the contract to reduce hours, but the Union is in part to blame for causing the Company's need to reduce hours. Since January, the Employer has warned the Union time and again that the non-union Festival Foods stores were going to compete for Piggly Wiggly business, especially in Sheboygan. We have asked the Union why it is not organizing the non-union stores to create a level playing field. Also, why is the Union not picketing or handbilling the non-union stores telling the potential customer to not favor the non-union store and shop at the Union represented Piggly Wiggly store? I do not understand why the Union is not doing something to support the Store and our Union employee's jobs ….

(Jt. Ex. 46.) There is evidence that this letter was also posted in the store. (Tr. 102:3-22.)

During the trial on February 22 and 23, 2012, Withers testified that the term "business needs" in Section 3.3 of the Collective Bargaining Agreement has an explicit meaning that limits when respondent can reduce the hours of its employees from full-time

8

to part time. (Tr. 530:2-25). Withers testified that respondent and the Union bargained over the term "business needs" and reached an agreement, which limits management's discretion:

> And the example that was given was if a Festival Foods opened up across the street - ironically, we were talking about Festival back at that time as well – that there had to be some component to address the Union's concerns as far as the Employer's unilateral right to reduce full-time and to address the Employer's concerns about reduced business needs, so - or reduced business. So that's why we developed or agreed to the "business needs" language, because it was something tangible that we could both review.

(*Id*. at 530:12-21.)

Withers admitted that a "40% reduction" was an example and that there was no agreed upon trigger number in terms of reduced sales for a reduction in hours. (*Id.* at 533:1-5.) In addition, he admitted that respondent warned the Union in January that Festival Foods was coming to Sheboygan. (*Id.* at 398:12-24.) In 2010 the parties utilized Section 3.3 when three employees, Sue Sanders, Lisa Barthels, and Ka Yang Lo, were reduced from full-time to part-time after another store closed and employees transferred into Store 15. (*Id.* at 423:21-435:11.)

Holtz testified that Festival Foods opened on September 16, 2011, which was the same day he posted the schedule moving 19 employees from full-time to part-time. (*Id.* at 509:5-11.) Holtz also testified that Store 15 lost 5% of total sales in the first week when Festival Foods was open for three days. (*Id.* at 509:12-510:6.) The loss of sales following the opening of Festival Foods averaged 13% over the course of the next six weeks. (*Id.* at 510:7-7; 527:5.)

9

Holtz testified that the decision to reduce the hours of employees was due to the impact of a competing grocery store, Festival Foods, opening within a few miles of Store 15. (*Id.* at 76:10-17.) There was no consideration of whether an employee was a union member. (*Id.* at 22-23.) Nor was there any consideration as to whether an employee had benefits as a full-time or a part-time employee under the collective bargaining agreement. (*Id.* at 81:25-82:6.)

In addition, Holtz stated that the decision to reduce scheduled hours "was based on the fact that we knew that our sales were going to decrease, which means there is less actual work to perform in the building." (*Id.* at 82:9-13.) Holtz further testified that in August he worked with John Braunreiter as they tried to anticipate the impact on the store in terms of decreased sales. (*Id.* at 92:4-25.) His decision to post a schedule with reduced hours was motivated by his desire to match the decreased workload. (*Id.* at 82:9-13; 100:3-19.) Holtz noted that he posts new schedules for the following calendar week every Thursday. (*Id.* at 99:17-20.)

Former bargaining unit employee, Laurie Hoffman (*Id.* at 161:14-162:12), and current employee, David Meinhardt (*Id.* at 251:2-252:14), admitted that they did not apply for any full-time positions at Store 15. On cross-examination Hoffman also acknowledged that she walked out of her grievance meeting after being told that she could bump two other employees to stay in a full-time position and that she did not refuse the full-time position she was offered during the grievance meeting. (*Id.* at 160:7-21 and 161:1-16.) She further admitted that after she walked out of the grievance meeting she went to Festival Foods on September 27, 2011, where she had previously interviewed in June of

2011, and talked to someone at Festival Foods about full-time employment with Festival Foods. *(Id*. at 161:14-162:12.) Jeff Gross testified he obtained new employment that pays a higher hourly wage and provides health benefits. (*Id.* at 191:6-192:7.)

Hoffman admitted she was offered another full-time position as Liquor Department Manager with respondent after she was employed full-time at Festival Foods but that she rejected the offer. (*Id.* at 152:24-153:18.) David Meinhardt admitted he was aware that two full-time positions (Customer Service Manager and Liquor Department manager) were open full-time bargaining unit positions at Store No. 15 in January and February of 2012, and that he did not apply for the positions and could not explain why did he did not apply for these open full-time positions. (*Id.* at 251:2-252:21-22.)

Hoffman admitted that her insurance stayed in effect until December and that she did not lose any insurance coverage while working for respondent. (*Id.* at 159:25-160:6.) Current bargaining employee, Laurie Hoppert, also acknowledged that she did not lose her insurance. (*Id.* at 200:13-210:13.) Hoppert returned to full-time in November in an office position with the respondent. (*Id.* at 201:6-17.)

Another current bargaining unit employee, Robin Schubert, testified that she went back to full-time when another person in her department left (*Id.* 220:2-7) and admitted that she never lost her insurance. (*Id.* at 220:2-7; 221:10-15). Schubert also testified that her Department Manager, Denise Perl, told her and another employee in her department that they might be reduced to part-time. (*Id.* at 223:1-22.)

The trial testimony also established that respondent met on September 21 with the Union to process its grievances for all 19 of the employees who were reduced from

11

full-time to part-time on the September schedule. (*Id.* at 93-24-95:23; 322:21-323:10; 324:24-326:7.) Respondent met with the Union again on November 8 to mediate the grievances for all 19 of the employees who were reduced from full-time to part-time on the September 16 Schedule. (*Id.* at 355:6-25; 436:15; 437:17.) As a result of these meetings, Laura Hoffman (435:8-16), Laurie Hauptman (433:15-434:7) and Tammie Helder (435:17-24) returned to full-time status pursuant to contractual bumping rights. (*Id.* 435:25-436:5.)

Daniel Holtz stated in his affidavit that on Thursday, February 23, 2012, he posted a schedule for employees at Store 15 for the week ending March 3, 2012, which provided 40 hours per week for the following bargaining unit employees and restored them to full-time status: Tammie Edler, Tanya Gruenke, Kelly Haack, Laurie Hauppert, Sue Fliss, Kimberly Fischer, Abe Gerharz, Debbie Gerdes, Dave Meinhardt, Louis Rosden, Robin Schubert, Andy Sommersberger, Brenda Thede, and Tanya Wiesfield. (Holtz Aff. ¶¶ 4, 5.) Holtz further stated that the subsequent schedule posted on March 1, 2012, for the next work week scheduled these employees for another 40 hour week. (*Id.* at ¶¶ 6, 7.) According to Holtz, these employees are eligible for benefits, including health insurance, and were returned to full-time status for the foreseeable future. (*Id.* at ¶¶ 8, 9.) In addition, Holtz testified that the total number of employees has increased by three since September of 2011. (Id. at 118:8-18.)

Former bargaining unit employee, Lauriel Hanson, testified that she did not see the letters written by Mary Zenisek, but that her attitude toward the Union did not change after

12

she was moved from full-time to part-time. (*Id.* at 183:6-184:14.) To date, the Board has not issued its decision.

Conclusions of Law

The court begins the analysis with the acknowledgment that section 10(j) relief is an extraordinary remedy designed to prevent employers from taking advantage of the "extraordinarily slow" N.L.R.B. resolution process to quash union support in the interim. *Spurlino Materials, LLC*, 546 F.3d at 500. The longer that an employer is able to chill union participation or avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent employees effectively once the N.L.R.B. issues its final order*. Francisco Foods, Inc.*, 276 F.3d at 297. This court does not have a timetable for when the Board will issue its decision, but the parties have indicated that their post-hearing briefs were due to the ALJ by March 29, 2012.

Petitioner's focus in seeking injunctive relief is on the "unilateral reduction" of the 19 bargaining unit employees from full to part-time status and the corresponding reduction in take-home pay and benefits. In addition, the petitioner relies on the respondent's actions, which it feels has undermined the Union and affected the Union's ability to represent its members.

Section 10(j) does not confer jurisdiction on this court to rule on the merits of this unfair labor practice dispute. *Spurlino Materials, LLC*, 546 F.3d at 502. Accordingly, the likelihood of success on the merits requires the court to "evaluate[] only on a preliminary basis the Director's probability of success before the Board." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 287 (7th Cir. 2001). Petitioner maintains that it has demonstrated a

13

strong likelihood of success in proving violations of Sections 8(a)(1), (3), and (5). Section 8(a) of the Act states in relevant part:

> It shall be an unfair labor practice for an employer:
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> (3) by discrimination in regard to hire or enure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .
>
> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
> 29 U.S.C. §§ 158(a)(1), (3), and (5).

It is well settled law that when parties are engaged in negotiations over a collective bargaining agreement, the employer must refrain from making unilateral changes, absent an impasse in bargaining for the agreement as a whole. *RBE Electronics of S.D.*, 320 N.L.R.B. 81, 81 (1995). Indeed, Section 8(a)(5) obligates the employer to notify and consult with the Union regarding changes in the conditions of employment before imposing the changes. *N.L.R.B. v. Katz*, 369 U.S. 736 (1962). Moreover, absent a clear and unmistakable waiver, an employer's failure to provide the union with prior notice and an opportunity to bargain over unilateral changes to the hours and/or days violates Section 8(a)(5). *See N.L.R.B. v. Hardesty Co., Inc.*, 336 N.L.R.B. 258, 259 (2001), *enfd.* 308 F.3d 859 (8th Cir. 2002). There is no dispute that this case involves a unilateral change. The evidence establishes that the respondent individually notified the 19 bargaining unit employees that their full-time positions were being reduced to part-time effective September 18, 2011. Respondent never provided the Union with prior notice of the

14

reduction in hours. However, there is evidence that during a January 7, 2011, meeting, the respondent and Union discussed a competitor opening a nearby store.

Whether petitioner has established a likelihood of success turns on whether respondent maintained a contractual right to continue adjusting employee schedules after the expiration of the collective bargaining agreements or could make those changes consistent with past practice. Article III, Section 3.3. of the CBA sets forth the procedure for scheduling employee work hours based upon employees' contractually defined seniority. According to respondent, Section 3.3 survived contract expiration and became a term and condition of employment that must be maintained under prevailing Board law as the status quo ante until the parties reach a successor agreement or impasse. *See e.g. Frontier Homes Corp. and Un. Steel Workers of Am., AFL CIO*, 153 N.L.R.B. 1070, 1076 (1965).

Section 3.3 of the CBA provides as follows:

3.3 The Employer will schedule hours of work on a seniority basis. The Employer will schedule employees who are full-time within the meaning of this Agreement for hours not below the full-time classification threshold unless:

>   (I)   The employee requests a temporary reduction in hours for two or more weeks and/or

>   (ii)   The employer makes a permanent reduction in the full-time positions in a classification based on business needs.

Employees who are reduced in hours may, by seniority, assume the full schedule of less senior employees within the department classification in order to maintain his/her regular number of hours; however, such assumed schedule shall not result in overtime. Nothing herein shall limit the right of the Employer to establish the schedule of hours of work.

15

The Board has held that absent evidence of the parties' contrary intention, reservation of rights provisions or management rights provisions do not survive the expiration of the contract. *See E.I. DuPont de Nemours*, 355 N.L.R.B. No. 176, slip op. at 3 (August 27, 2010). There is no evidence that the parties intended this provision to survive. Nevertheless, *Beverly Health and Rehabilitation Services*, 297 F.3d 468 (6th Cir. 2002), has been cited for its ruling that a pattern of unilateral change can become a term and condition of employment and that a similar unilateral change after the termination of the agreement is permissible to maintain the status quo.

However, the evidence of a "pattern" is limited to a one-time event in 2010 when respondent closed a store and transferred three full-time employees in the deli department to Store 15 with part-time hours because the deli department was overstaffed. There are obvious differences between the 2010 reductions and the present reductions, which affected 19 employees *after* the expiration of the agreements. According to the petitioner, 19 employees is nearly 35% of the work force. In addition, the respondent did not hire additional part-time employees in 2010, however there is evidence that following the reductions at issue the respondent hired additional part-time employees to work at Store 15. For these reasons, the court is not persuaded that the 2010 example is the type of reduction that would lead employees to reasonably expect the practice to continue or recur on a regular and consistent basis.

Having found that petitioner's chances of success on the merits are better than negligible, the next issue is whether there is an adequate remedy at law or irreparable harm that will occur. The United States Supreme Court in *Winter v. Natural Res. Def. Council* held that the plaintiff seeking preliminary injunctive relief must demonstrate that

16

Case 2:12-cv-00152-CNC   Filed 05/17/12   Page 16 of 20   Document 35

irreparable injury is likely in the absence of an injunction. 129 S. Ct. 365, 375 (2008). Petitioner argues that the irreparable harm is caused by the loss of health insurance coverage. In addition, the petitioner asserts that the respondent's refusal to bargain collectively disrupts employee morale and discourages Union membership.

During the hearing, counsel for respondent indicated that all employees who remained at Store 15 have returned to full-time status and are eligible for health insurance. The key language is "employees who have remained." Four employees resigned. Moreover, the terms of the collective bargaining agreements require that an employee work 35 or more hours per week for four consecutive weeks during the calendar month before the employee can be covered under the health and welfare funds. In addition, petitioner represents that at least one of the employees, Pat Gruenke, was forced to borrow against her Social Security to make payments to maintain her health insurance. Certain other employees were forced to forego needed medication and preventative treatment.

There is also evidence that in February of 2012, respondent made additional reductions in hours without providing the Union with the opportunity to bargain over the decision. These actions taken without Union participation continue to shift the status quo and hinder the Union's ability to effectively represent Store 15 employees. Indeed, the day before the hearing in this court, petitioner filed the affidavits of Shantal Edler, Sue Fliss, Debra Gerdes, Pat Guenke, Kelly Haack, Laura Hoffman, Laurie Hoppert, David Meinhardt, Tina Meinhardt, Robin Schubert, Andrew Sommersberger, Tanya Weisfield, and Grant Withers. Each of these individuals indicated that employees are frustrated with the Union, "fed up and disgusted with the Union," or otherwise feel that the Union is powerless in comparison to their employer. Sue Fliss stated under oath that negative

17

feelings about the Union before the reductions have intensified. Andrew Sommersberger wrote:

> Before the reduction of the full-timers, people did not really talk about the Union – I am sure there were some that were happy with the Union and some that did not like the Union – but now it seems like everyone has a very negative opinion about the Union. We feel this way because the Company is just doing whatever it wants with its employees and the Union can't do anything about it."

In addition, Holtz's notes of September 15, 2011, indicate that an employee had come to him asking how to decertify the Union and that "many, the majority of the full-time and most of the part time would be interested in voting the union out." Holtz gave the employee a contact provided by Zenisek. (G.C. Ex. 140.)

These affidavits and exhibits must be weighed against evidence that: (1) the Union has established majority status and has processed 19 grievances under the expired agreements (2) Lauriel Hanson, who is alleged to have been constructively discharged, testified at the administrative hearing that the reduction in hours did not change her opinion of the Union; and (3) there is no evidence that any employee has resigned membership in the Union since September of 2011. In the final analysis, that one employee's opinion has not been affected or that no employee has resigned to date does not mean there has been no harm.

When considering the balance of hardships, the court takes into account "the probability that declining to issue the injunction will permit the alleged[ ] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *Frankl*, 650 F.3d at 1365. The Seventh Circuit has likewise commented, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished. The

18

deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." *Electro–Voice, Inc.*, 83 F.3d at 1573.

Given the unilateral reductions, open hostility to the Union, the respondent's efforts to undermine the Union's credibility, granting injunctive relief appears to be the prudent course. The economic impact to respondent appears to be overstated where the respondent concedes that all but four have returned to full-time with access to health insurance and that the remaining four have indicated that they do not wish to return to Store 15. There is a strong public interest in the integrity of the collective bargaining process." *Bloedorn*, 276 F.3d at 300 (internal quotation marks omitted). That interest is furthered, in part, by ensuring that an unfair labor practice will not succeed" because of the protracted nature of Board adjudication. *Electro–Voice*, 83 F.3d at 1574 (internal quotation marks omitted). Similarly, the public interest is harmed when the N.L.R.B.'s remedial powers lose their effectiveness due to the passage of time. *Lineback*, 979 F. Supp. at 847.

As a final matter, when issuing injunctive relief, the court must state the reasons why an injunction is issued, state the terms of the injunction with specificity, and describe in reasonable detail the act or acts restrained. Fed. R. Civ. P. 65(d); *Spurlino*, 546 F.3d at 504. The scope of injunctive relief is limited to restraining only those acts which are "of the same type or class as [the] unlawful acts which the court has found to have been committed or whose commission in the future[,] unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Id. (quoting N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435–37, 61 S. Ct. 693, 85 L. Ed. 930 (1941)). Because the petitioner's requested relief is appropriate in scope,

19

IT IS ORDERED that respondent's motion to dismiss is denied.

IT IS FURTHER ORDERED that petitioner's motion for injunctive relief is granted.

Dated at Milwaukee, Wisconsin, this 17th day of May, 2012.

                BY THE COURT

                /s/ C. N. Clevert, Jr.
                C. N. CLEVERT, JR.
                CHIEF U. S. DISTRICT JUDGE